**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**AARON BARKSDALE, et al.,**

**Plaintiffs,**

**v.**

**THE CITY OF GROVE CITY, et al.,**

**Defendants.**

**Case No. 2:24-cv-4084**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Jolson**

## OPINION AND ORDER

Aaron and Tara Barksdale registered their son, K.B., for Grove City's fall baseball league for children aged seven and eight. K.B. has autism and ADHD, and he needs various changes to usual practices to participate. The Barksdales, on K.B.'s behalf, claim that the City did not make the necessary changes. They also claim that K.B. was mistreated and harmed by the City and its agents during his brief time participating in the league. The Barksdales sued under federal disability discrimination law, and they also brought a slew of Ohio-law claims against the City, its Parks Department, and various of the City's agents connected to the baseball league. The defendants have all moved for summary judgment on all of the Barksdales' claims. (Doc. 42). For the reasons below, the Court **GRANTS** that motion as to the Barksdales' federal-law claims. And, in light of that decision, the Court **DECLINES** to exercise supplemental jurisdiction over the remaining state-law claims and **DISMISSES** those claims without prejudice.

## BACKGROUND

Grove City runs a variety of youth baseball leagues through its Department of Parks and Recreation. (Doc. 42-1, #516). The Barksdales signed up their son, K.B., to participate in the 7- to 8-year-old fall league in 2024. (Tara Barksdale Dep., Doc. 39-1, #378–79). K.B. has autism and ADHD, and Tara Barksdale indicated as much when signing him up. (*Id.*). She testified that she had called the City prior to registering K.B. to inquire about the City's ability to accommodate K.B.'s needs. (Doc. 39, #274). Specifically, she says she informed someone with the City that K.B. was autistic and "would not be able to make eye contact," and, to avoid interfering with other children, that he "would periodically have to step out of line because he would spin," and "sometimes throw dirt." (*Id.* at #273). Tara[1] added that K.B. "needed to stay in one position, but could interchange back and forth between shortstop and second [base] to allow other children to try the other positions." (*Id.*). Finally, she said that her husband, Aaron, would need to be an assistant coach so he could be available to "redirect" K.B. if he began talking at inopportune times. (*Id.* at #273–74).

The Parks Department's Sports and Fitness Supervisor, Jason Barnes, oversees the youth baseball leagues. (Barnes Dec., Doc. 41-3, #405). He selects coaches and assigns kids to teams. (*Id.* at #406–08). The league sign-up form includes a place where a parent can identify any "special considerations" related to their child's participation. (*Id.* at #408). Consistent with what Tara said she told the City during the call described above, when she registered K.B., she explained that he has autism

[1] Given that the Barksdales share a last name, the Court will refer to each by their first name.

and ADHD and that it would be beneficial for either her or her husband to serve as an assistant coach. (Doc. 39-1, #378).

Barnes, when assigning children to teams, accounts for the special considerations disclosed on the forms. (*Id.* at #408). Given K.B.'s situation, Barnes aimed to assign him to a team with an experienced coach who had received good reviews from other parents in the past. (Doc. 41-3, #408). Accordingly, he put K.B. on the "Bulls," coached by Douglas Winks, Jr., who had experience in the league and had received positive feedback. (*Id.*).

After the assignment, Mrs. Barksdale texted and spoke on the phone with Coach Winks about K.B.'s needs. (Doc. 39, #282). She discussed the possibility of her husband serving as an assistant coach to help support K.B. (Doc. 39-1, #380–82). And she informed Winks directly of the same accommodations regarding K.B. that she had discussed on the phone with someone at the City before registration. (*See* Doc. 39, #283–84). Winks welcomed the possibility of Aaron serving as an assistant coach and told her how to get the ball rolling with the City on that front. (Doc. 39-1, #380–82). As for other modifications, she says Winks told her that it "shouldn't be a problem," and that he did "things [his] way, but [K.B. will] have a great time." (Doc. 39, #285).

By the time of the first practice, the City had approved Aaron to serve as an assistant coach. (Aaron Barksdale Dep., Doc. 38, #181–82). Aaron testifies that, at the first practice, he informed Winks that K.B. "did not like to be moved positions," and "that he worked best at short and second base." (*Id.* at #182). According to Aaron,

Winks responded similarly to how he had responded to Tara: "it was stated to me [that] he does things his way and he moves kids around to every position, but he'll have fun." (*Id.*). At that first practice, little of note happened, though the Barksdales were concerned that Winks might not be taking K.B.'s special needs as seriously as they had hoped. (Doc. 39, #290–91; *see also* Doc. 38 at #183–84). For the second and third practices, Winks was out of town, so Aaron took the leading role. (Doc. 38, #184). One parent complained to both Aaron and the league about K.B.'s behavior. (*Id.* at #184–85). According to that parent, K.B. was yelling profanities during practice and throwing dirt at the other kids. (Doc. 41-3, #409). But apart from that, again, little happened.

The fourth practice was on August 10, 2024. Winks was present, having returned from vacation. (Doc. 38, #184–85). And in response to the one parent's complaint about K.B., the Parks Department sent one of its part-time employees—Brandy Wolford, by trade a special education teacher—to observe the practice. (Doc. 41-3, #409–10; Wolford Dec., Doc. 41-1, #393–95). The events of that practice are the centerpiece of this case.

According to the Barksdales, Winks behaved inconsistently with many of the requests they had made. For example, Aaron says that Winks instructed K.B., in a "very rude and very direct" way, not to yell at Winks. (Doc. 38, #186). Aaron and Tara say that Winks's behavior to this effect "was focused on my son and nobody else in that practice." (*Id.*; Doc. 39, #294).

Beyond that, Winks put K.B. at positions other than shortstop and second base. (Doc. 38, #186). At first, K.B. was upset about playing third base, but after Aaron calmed him down, he managed to stay there. (*Id.*). Later, Winks tried to put K.B. in another position that wasn't shortstop or second base, and K.B. "br[oke] down." (*Id.*). Again Aaron calmed him down, but this time Winks moved K.B. back to shortstop after Aaron complained. (*Id.* at #186–87).

For much of the practice, Aaron was not with K.B., as he had other responsibilities as an assistant coach. (*Id.* at #188). But, according to Tara, who was in the stands, K.B. became increasingly upset as the practice went on. (Doc. 39, #295). Things came to a head when Winks was pitching batting practice to the kids and K.B. came up to the plate. According to Tara, K.B. was "very worked up" and was "swinging at anything." (*Id.*). Frustratingly for him, "he was foul tipping a lot of balls." (*Id.*). What happened next is the subject of some dispute.

Tara says that Coach Winks paused throwing to K.B. and walked up to him. Then he "crossed his arms and said, 'look at me.'" (*Id.*). Next, she says, Winks grabbed K.B. "on either side of his helmet and jerked his head backwards and screamed at him and said, 'I said look at me.'" (*Id.* at #295–96). K.B. then started screaming and said, "you're hurting my neck." (*Id.* at #296). Tara then raced to the backstop fence and shouted something, though she does not remember what. (*Id.*). At that point, Winks let go of K.B., who then ran to her crying. (*Id.*). She says that K.B. then ran back onto the field and asked Winks what to do for the remainder of practice, whereupon Winks again screamed at K.B., telling him not to yell at him. (*Id.* at #297).

Tara called the City a few days later and spoke to Barnes, explaining all this. (*Id.* at #301). She also emailed Barnes explaining her version of events. (Doc. 39-1, #383–84). Barnes responded, telling the Barksdales that the City took the issue very seriously and would continue investigating it. (*Id.* at #386). He also offered that, if the Barksdales thought it would be in K.B.'s best interest not to continue with Winks, the City would refund their money. (*Id.*). Further, he said that they would always have site coordinators (part-time employees such as Wolford) available during practices or games if Tara or Aaron had any concerns. (*Id.*).

After that, the Barksdales contacted the police. (Doc. 39, #310). The police took Tara's report over the phone and interviewed Winks and some other parents who witnessed the incident. (Doc. 39-1, #387–88). Winks told them that he placed his hand on K.B.'s helmet without intending to do any harm, as he has done with many kids in his years of coaching. (*Id.* at #388). As soon as K.B. began to yell, Winks removed his hand. (*Id.*). In his declaration, he adds that it was at this point the Barksdales told him that K.B. does not like to have his head touched. (Doc. 41-2, #400). The other parent recalled the incident but told the police that Winks merely placed his hand on top of K.B.'s helmet; he also offered that Winks had not yelled at K.B. (Doc. 39-1, #388). Based on these accounts, as well as the Parks Department's post-investigation determination that Winks would stay on as a coach, the police concluded that there was "not any evidence of there being an assault." (*Id.*).

For her part, Wolford (the special education teacher the City had sent to watch) did not see the at-bat, but she observed the rest of the practice. (Doc. 41-1, #395). She

says that K.B. appeared "emotionally dysregulated" throughout the practice, kicking and stomping in the dirt and, when he was frustrated, hitting himself in the head. (*Id.*). As for Winks, she says he maintained distance from K.B. and spoke softly when trying to calm him down. (*Id.*). She says she did not witness Winks "display any behavior that [she] would describe as aggressive, or even assertive." (*Id.*).

On September 24, 2024, the police decided that they would take no further action. (Doc. 39-1, #387). About a month later, the Barksdales decided that they would—they filed this suit. (Doc. 1). As defendants, they named the City, the Parks Department, Richard Stage (the mayor of Grove City), Barnes, Jack Castle (the director of the Parks Department), Winks, and finally, it seems, Wolford (whose name was unknown when the complaint was filed). (*Id.* at #3–5). The defendants moved for summary judgment; and that is now fully briefed. (Doc. 42; Doc. 49; Doc. 50). The matter is thus ripe for decision.

## LEGAL STANDARD

A party can win summary judgment on an issue if they "show[] that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the Court must keep in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986)). But the non-moving party cannot defeat the motion merely by pointing to *any* factual dispute. Rather, "the requirement is that there be [a] genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In short, the nonmoving party must present some "sufficient disagreement" that would require submission to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In deciding whether they have made a sufficient showing for a reasonable jury to find for them, though, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That is, "the court must afford all reasonable inferences … to the nonmoving party." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## LAW & ANALYSIS

The Barksdales bring fourteen claims: (1) violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, (2) violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, (3) violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. (R.C.) § 1345.02, (4) negligent hiring, training, supervision, and retention, (5) negligence per se for endangering children in violation of R.C. § 2919.22, (6) battery, (7) assault, (8) negligence per se for failing to report injury in violation of R.C. § 2151.421, (9) intentional infliction of emotional distress, (10) breach of fiduciary duty, (11) promissory estoppel, (12) negligent

misrepresentation, (13) loss of consortium, and (14) respondeat superior. Only two of them (Counts 1 and 2) are federal claims. The rest arise under Ohio law.

**A. The Barksdales' Disability Discrimination Claims Fail.**

The Barksdales' two federal-law claims assert disability discrimination, one under Title II of the ADA, 42 U.S.C. § 12132, and one under section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The ADA and the Rehabilitation Act "provide the same remedies, procedures, and rights." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (citing *Thompson v. Williams Cnty*, 219 F.3d 555, 557 n.3 (6th Cir. 2000)). So one analysis suffices to cover both of the Barksdales' federal claims.

Title II of the ADA creates two types of claims against public entities that receive federal funds, "claims for intentional discrimination and claims for a reasonable accommodation." *Roell v. Hamilton Cnty.*, 870 F.3d 471, 488 (6th Cir. 2017). The complaint attacks the City's "deliberate indifference in failing to accommodate K.B.'s and the Barksdale's reasonable requests." (Doc. 1, #10). So the Barksdales seem to be raising the latter—a failure-to-accommodate claim. In any event, as they have generated no evidence of animus, which is required for a claim of intentional discrimination, *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015), the Court will treat this as an accommodation claim.

For such a claim, the Barksdales need not "present additional evidence of discriminatory intent." *Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024). Rather, they must show (1) K.B. "has a qualifying disability," (2) "he is otherwise qualified" to participate in the program, and (3) "he was excluded from" or "denied the benefits

of" the program because the City failed to provide a reasonable accommodation. *Id.* As for the nature of the accommodation, Title II plaintiffs are only entitled to accommodations that are "necessary" to provide "'meaningful access' to the covered entity's programs or services." *Id.* at 821 (quoting *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023)). The City thus did not need to provide the Barksdales' "preferred accommodation" so long as it offered an alternative that provided meaningful access. *Id.* (quoting *Bennett*, 86 F.4th at 326).

The first two elements do not pose a problem for the Barksdales. As for the first, nobody disputes that K.B. has a qualifying disability. And, while defendants do not seem to concede that he is "otherwise qualified" to participate in fall ball, he appears to have met all the registration requirements, so the Court will assume that he was.

But while the Barksdales clear the first two elements, they stumble on the third. The City provided many of the Barksdales' requested accommodations. Winks and the City, it seems, gladly took Aaron on as an assistant coach. In that capacity, he could look after K.B. and help calm him down as needed. Defendants also allowed K.B. to step out of lines, throw dirt, and talk. That leaves three other potential issues: (1) K.B. playing only shortstop and second base, (2) K.B.'s problems making eye contact with others, and (3) allowing K.B. to switch to a different team within the league after the incident during batting practice.

Start with the first. To begin with, it is debatable whether the City or any of its agents were on notice that the request to stay at shortstop and second base related

to K.B.'s disability. Tara's pre-season texts with Winks on this matter say only that "[h]e played Short Stop and really did well with everything but needs some support with focus." (Doc. 39-1, #380). Beyond that, Aaron testified that he informed Winks that K.B. "did not like to be moved positions, and "that he worked best at short and second base." (Doc. 38, #182). So it may be that the City is not chargeable with notice that this accommodation would help K.B. participate in the league. Winks declared that he "thought K.B. just liked to play shortstop, like many kids have a favorite position in the field." (Doc. 41-2, #400).

Even assuming there was enough for the City to be on notice, K.B. evidently did not actually need this accommodation for meaningful access to the baseball program. During the fourth practice, Winks moved K.B. to third base for a bit. (Doc. 38, #186). While K.B. was upset at first, even Aaron admits that K.B. calmed down and managed to play the new position. (*Id.*). The obvious inference from that exchange is that the City's efforts to accommodate K.B.—letting Aaron be present to calm K.B.—were working as intended.

Beyond the practical demonstration that K.B. did not need to play only shortstop and second base, there is the problem that the Barksdales do not base this request on any kind of medical judgment about K.B.'s autism. Instead, they simply point to their personal experience coaching K.B. in a previous league where they kept him at shortstop and second base. (Doc. 39, #242–43). And the reasons they offer as to why K.B. preferred shortstop or second (that he found it easier to focus in infield positions where you make throws—i.e., anywhere but first base) apply equally to

third base. (*See id.* at #243–44). It's perhaps not surprising, then, that K.B. eventually got comfortable at that position. So, even assuming the specific-position accommodation was a reasonable request (which is a big assumption), there is not enough evidence for a reasonable jury to conclude that K.B. in fact needed to alternate between only shortstop and second base to be able to participate in the City's 7- to 8-year-old fall baseball league.

Moving on to the second issue: eye contact. The Court also concludes that, even accepting the Barksdales' version of events as true, as the Court must at summary judgment, Coach Winks's alleged effort to make eye contact with K.B. did not violate Title II. In reaching that conclusion, the Court acknowledges that it may well be that the City had notice of the need for this accommodation.[2] Tara, as noted above, testifies that she told Winks about this issue in the same phone call where she explained K.B.'s other needs. (*See* Doc. 39, #283–84). So plaintiffs meet that threshold burden. Beyond that, however, the Court, again crediting Tara's account as true, concludes that the City provided this accommodation in a manner sufficient to allow K.B. to access the baseball league notwithstanding Winks allegedly commanding K.B. to "look at" him. (*Id.* at #295). Importantly, the one batting-practice incident is the only alleged instance of a City agent (if Winks is in fact a City agent) deviating from the Barksdales' request that people avoid eye contact with K.B. That matters because, even assuming a request for no eye contact amounts to a reasonable accommodation,

---

[2] One point of confusion that hovers over this case is whether the City can be liable for in-the-moment decisions by Winks on a Title II theory. Because the Barksdales' claims fail on other grounds, the Court neither addresses nor decides this question.

the coach's single instance of failing to abide by that request does not suffice to make out a failure-to-accommodate claim.

To see why that is so, start with the ADA's text. Title II forbids public entities from "exclud[ing]" individuals with a disability "from participation in" its "services, programs, or activities." 42 U.S.C. § 12132. It also prohibits "discrimination" by such entities. *Id.* Claims for a reasonable accommodation, if they come from the text of § 12132 at all, must come from "the first part of the text that does not use the word 'discrimination.'" *Booth v. Lazzara*, 164 F.4th 581, 596 (6th Cir. 2026) (Murphy, J., concurring); *accord Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 909–10 (6th Cir. 2004). So a failure to accommodate cannot support a Title II claim unless that failure causes the disabled individual to be excluded from participation in the relevant program. Here, though, K.B. could well have continued participating after the incident. He in fact did so, returning to the field after the batting practice incident and finishing the rest of the practice. (Doc. 39, #297).

And it is not only that statute's text that points that way; courts facing similar questions have reached the same result: Title II requires reasonable and effective accommodation, not error-free observance of an accommodation protocol.[3] Where the

[3] *See Moore v. Curtis*, 68 F. App'x 561, 563 (6th Cir. 2003) (denying a prisoner's Title II claim where his only injuries were "isolated instances where he missed meals or privileges"); *McCord v. Ohio Dep't of Rehab. & Corr.*, No. 1:10-cv-2355, 2011 WL 768079, at *2 (N.D. Ohio Feb. 28, 2011) ("Allegations of isolated instances of failing to accommodate a disabled prisoner's condition do not state a claim under the ADA."); *Vilardo v. Jordan*, No. 5:23-cv-P49, 2023 WL 6151239, at *2 (W.D. Ky. Sep. 20, 2023) (single incident insufficient to state a claim under the ADA); *Wainwright v. Med. Dep't Cuyahoga Cnty. Corr. Ctr.*, No. 1:17-cv-1621, 2018 WL 3537122, at *3 (N.D. Ohio July 23, 2018); *Martin v. Sinclair Cmty. Coll.*, No. 4:16-cv-1074, 2016 WL 4065956, at *2 n.1 (N.D. Ohio July 29, 2016) (dismissing Title II claim where the plaintiff "d[id] not allege a pattern of failure to provide accommodations for his

City adopted and generally implemented the requested accommodation, a single, isolated departure from that protocol—particularly one the City neither directed nor ratified—does not itself permit a reasonable inference that the City failed to accommodate K.B.

Perhaps, though, the concern was not the coach's command to look him in the eye, but rather the coach touching K.B.'s head. But if so, the analysis is similar. Under either of the competing accounts of the underlying events on this front, the league continued to accommodate K.B.'s disability. Given what had happened, Winks now was on notice that he needed to refrain from touching K.B.'s head. Winks declared that this was the first time he learned that K.B. did not like his head touched. (Doc. 41-2, #400). And the Barksdales do not claim that they alerted Winks or the City to K.B.'s sensitivity in this regard before that. So for the remainder of the season, in line with other modifications, Winks would have been able to avoid this problem. K.B. would have had access to the City's program with an entitlement to that added accommodation for the remainder of the season. Thus, K.B.'s disability related complaint—having his head touched—might not have impeded his participation. Nobody had a chance to demonstrate this, of course, because the Barksdales withdrew from the league before the next event. (*Id.* at #401).

alleged disability"). Admittedly, all of these cases involve *prisoners* advancing disability claims. But the underlying point remains—the ADA does not demand perfection in designing or implementing accommodations. Consistent with that, an isolated instance of non-compliance with an accommodation, especially when that instance occurs in the heat of the moment, is simply not the stuff of a meritorious ADA failure-to-accommodate claim.

The only other possible accommodation the Barksdales requested was moving K.B. to a different team after the August 10 batting practice incident. Reading between the lines, it seems likely that Tara asked for this in her conversation with Barnes the following week. (*See* Doc. 39-1, #386). And it appears that the City did not agree to this request, instead offering a refund or, if the Barksdales wished to give it another try, making site coordinators available to observe practices and games and respond to the Barksdales' questions or concerns. (*Id.*). But Title II did not require the City to switch K.B. to a different team because this, too, was not necessary for him to access the program. True, a switch may have been the Barksdales' *preferred* accommodation. But the ADA does not require the City to provide the preferred accommodation, merely an effective one. For the reasons explained above, the City already provided everything K.B. needed to access the league.

In sum, if Tara's description of the events at batting practice as a violent assault prove accurate, the Barksdales likely have legal remedies, but the ADA does not provide them. It is certainly understandable that the Barksdales would not want to stay with a coach who they say had assaulted their son. Perhaps as a policy matter the City should structure its program to let parents make swaps between teams after the start of the season. But Title II's mandate that public entities remove barriers that prevent disabled people from participating in public programs "by reason of … disability" does not require it to do so. 42 U.S.C. § 12132. So the Barksdales' ADA and Rehabilitation Act claims fail.

### B. The Court Declines to Exercise Jurisdiction over the Barksdales' State-Law Claims.

Now the Court has a decision to make. The Court has original jurisdiction over the matter only because this case "arises under" federal law. 28 U.S.C. § 1331. That is, the Barksdales assert claims to relief under federal statutes—the ADA and the Rehabilitation Act—that have been deemed to provide a private right of action. *See Barnes v. Gorman*, 536 U.S. 181, 184–85 (2002); *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). The Court's power to hear the Barksdales' state-law claims, on the other hand, depends on their being "so related to" their federal claims "that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). Here that test is met, as the Ohio-law claims arise out of "a 'common nucleus of operative fact,'" which is all that § 1367(a) requires. *Royal Canin U.S.A., Inc. v. Wullschleger*, 145 S. Ct. 41, 31 (2025) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

But just because the Court has power to hear the Barksdales' state-law claims does not mean the Court must do so. Section 1367(c) "explains that the supplemental jurisdiction [1367(a) confers] is in some measure discretionary." *Id.* That subsection identifies three situations (and a catch-all for "exceptional circumstances") where a district court can elect not to decide the merits of state-law claims. 28 U.S.C. § 1367(c). Specifically the Court "may decline to" take jurisdiction of otherwise-qualifying state-law claims if (1) they "raise[] a novel or complex issue of State law," (2) they "substantially predominate[] over the claim or claims over which the district

court has original jurisdiction," or (3) they are all that remain after the Court "has dismissed all claims over which it has original jurisdiction." *Id.*

So, having disposed of the Barksdales' two federal claims, the statute's plain language provides the Court discretion not to hear the remaining state-law claims. Indeed, if anything, the thumb is often on the scale in favor of a federal court dismissing such claims. As the Supreme Court has explained, if "federal law is not where the real action is," district courts "ordinarily should kick the case to state court." *Royal Canin*, 145 S. Ct. at 32 (citation modified). And the Sixth Circuit has taken that admonition perhaps even a step further: it has "repeatedly recognized that a district court should generally decline jurisdiction over state claims if it has resolved the federal claims before trial." *Cotterman v. City of Cincinnati*, No. 21-3659, 2023 WL 7132017, at *7 (6th Cir. Oct. 30, 2023) (collecting cases). Even at summary judgment, there is a "strong presumption" in favor of dismissing leftover state-law claims. *Id.* (quoting *Oberer Land Devs. Ltd. v. Sugarcreek Twp.*, No. 21-3834, 2022 WL 1773722, at *6 (6th Cir. June 1, 2022)).

And nothing here rebuts that presumption. If anything, the circumstances confirm that the Court should dismiss the Barksdales' state-law claims. Take the other bases for declining jurisdiction that § 1367(c) offers, novelty or complexity of the state-law issues and predominance of those issues in the case. Starting with the latter, the Barksdales' state-law claims outnumber their federal claims six to one (and twelve to one as a practical matter). And, as to the former, many of the Barksdales' theories of liability are less than traditional (e.g., contending that the facts of this

case make the City liable for deceptive and unconscionable trade practices under Ohio's consumer sales practices act, R.C. §§ 1345.02, .03 (Doc. 1, #11)). Further, it also appears that deciding the case will implicate sensitive state and local issues under Ohio's Political Subdivision Tort Liability Act. *See* R.C. § 2744.03. So while stated in a different context, prescient here is the Supreme Court's reminder that "no matter how seasoned the judgment of the district court may be [on matters of state law], it cannot escape being a forecast rather than a determination." *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 499 (1941). The Court thus concludes that the presumption against taking jurisdiction of leftover state-law claims controls here.

## CONCLUSION

For these reasons, the Court **GRANTS** defendants' Motion for Summary Judgment as to the Barksdales' federal-law claims (Doc. 42), **DECLINES** to exercise supplemental jurisdiction over their state-law claims, and **DISMISSES** those claims without prejudice. The clerk is **DIRECTED** to **TERMINATE** this matter on the Court's docket.

**SO ORDERED.**

September 29, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**